Mr. Justice Scott delivered the opinion of the Court. The main question to be determined in this case is, whether or not the order of payment made in.the probate court against Woodruff was a nullity. It is a question of great importance because it involves legal principles upon which some of the fundamental rules of property rest, on the stability of which in a great degree depends the repose of the country. The ground of the supposed nullity of the order in question is the want of previous notice to Woodruff and of any waiver of such on his part. And it is insisted that in every case a judgment or decree is a nullity, if it has not been preceded by notice, actual or constructive, to the party against whom it is rendered. This position is understood to be based upon a general proposition that such a proceeding would be directly against a law of nature that has been consecrated by the common law and by the immemorial usages of all civilized nations, and is therefore of paramount and universal obligation and must consequently have resistless sway. Man’s laws being strengthless before God’s laws (Noy’s Maxims, 19,) consequently a human law, directly contrary to the law of God, would be an absolute nullity. Doctor & Student, lib. 1, ch. 6. To sustain the position assumed upon the basis indicated the most imposing authority is relied upon. Among them, Fortes-amj, who says, in the case of The King vs. Pecham, Carth. 406, “ It is certain that natural justice requires that no man shall be condemned in judgment without notice.” And again, in the case of Rex vs. Cleg, 8 Mod. R., “ As to want”of notice natural justice requires that every man be heard before he be condemned in judgment unless through his own default.” And Chief Justice Marshall, in the case of The Mary, 3 Peters’ Cond. R. 312, said, “ It is a principle of natural law of universal obligation that before the rights of an individual can be bound by a judicial sentence he shall have notice, actual or implied of the proceedings against him.” And Judge Blackstone, in his commentaries (4 vol. p. 283,) when noticing the necessity of summoning a party defendant to give him an opportunity to defend, says, “ A rule to which all municipal laws that are founded upon the principles of justice have strictly conformed ; the Roman law requiring a citation at least, and our common law never suffering any fact, either civil or criminal, to be tried until it has previously compelled an appearance by the party concerned.” Other authority of like import might be cited, but it is believed these fairly present the character of the whole of such. In examining the question thus presented and supposed to be sustained, on one side, upon the basis assumed, we shall first inquire whether it be quite accurate to say that notice before judicial sentence is a law of nature, or at least of such universal application as seems to have been supposed, and whether indeed the common law has consecrated it as such by a strict conformity to its provisions. If we find it no law of nature at all, we shall be at full liberty to give effect to certain known rules of the common law, although inconsistent with this supposed law of nature. And even if we find it a law of nature, consecrated as such by the common law, nevertheless, if we find these known rules of the common law, to which we have alluded, equally as well authenticated as laws of nature, we will still be at liberty to give effect to them, as well as this supposed law of nature, by construing them all in pari materia, as a system of natural laws. We understand all laws to be either human or divine, according as they have man or God for their author, and divine laws arc of two kinds, that is to say, 1st, Natural laws ; 2d, Positive or revealed laws. A natural law is defined by BusLAMaui to be “ A rule which so necessarily agrees with the nature and state of man, that, with out observing its maxims, the peace and happiness of society can never be preserved.” And he says that these are called natural laws, “ because a knowledge of them may be attained merely by the light of reason, from the fact of their essential agreeableness with the constitution of human nature: while, on the contrary, positive or revealed laws are not founded upon the general constitution of human nature but only upon the will of God; though in other respects such law is established upon very good reason and procures the advantage of those to whom it is sent. The ceremonial or political laws of the Jews are of this latter class. So, all rights which appertain to man arc of one or the other of two classes, that is to say, 1st, natural rights ; or 2d, acquired rights. The former are such as appertain originally and essentially to man, such as are inherent in his nature and which he enjoys as a man independent of any particular act on his side. The latter, on the contrary, are those which he does not naturally enjoy, but are owing to his own procurement. The right of providing for one’s preservation is of the one class ; while sovereignty or the right of commanding or the right to property are of the other class. The same author (Bürlamgüi) defines “ Justice in a judicial sense” to be “nothing more or less than exact conformity to some obligatory law”; and therefore he says that “ all human actions are either just or unjust as they are in conformity to or in opposition to law.” The doing of justice then in a judicial sense is the performance towards another of whatever is due to him in virtue of a perfect and rigorous right, the execution of which he may demand by forcible means unless we satisfy him freely and with good will. While, on the other hand, the performance of duties due to another only in virtue of an imperfect or non-rigerous obligation which cannot be insisted on by violent methods, but the fulfilling of which is left to each man’s honor and conscience, are comprehended under humanity, charity or benevolence in opposition to justice. Now according to these principles and definition which we have laid down from an author of the most unquestipnable authority on these points, if it be contrary to natural justice that a man should be condemned without notice and an opportunity to be heard, as is said by Fortesque, such is because it is a principle of natural law, as is said by Judge Marshall, that before the right of an individual can be bound by a judicial sentence he shall have notice actual or constructive of the proceedings against him. Because otherwise there could be no non-conformity to an obligatory law to bring such a human action within the definition of injustice. Such a natural law then is assumed by the remark of Fortesque and its existence is affirmatively asserted by Judge Marshall with the further remark that it is of “ universal obligation.” We would feel that it was presumption in us even indirectly to gainsay these great authorities, if we did not feel sure that they did not use these expressions in a scholastic sense, but only in that loose and general sense in which strong language is often used to affirm the existence of any highly important general rule of very extensive application. We feel therefore, in what we shall say on this point, that there is more of vindication from heretical inference from these general expressions than of assault, even covert, upon these great names. It is manifest at a glance that such a law of nature, as that supposed, could have had no operation even if it had existed before the establishment of the civil state and while man was in a state of nature. Because there was then no human right for such a law to act upon, so far at least as temporal affairs were concerned; no tribunal to enforce its mandates; no individual to claim its protection. In a word, there was no place for its operation among men in their temporal relations towards each other. If then it was a law of nature at all, it was a dormant rule, which, in that condition of man’s estate, could never have been derived by the light of reason from “ its essential agreeableness to the constitution of human .nature.” Because in that condition of man there could have been no data in the human mind from which reason could have essayed so far into civilization. Then if a Jaw of nature it could not have been developed from its dormant condition until after the establishment of the civil state. And then the same process' of reasoning that would de-velope it as such would develope many -other rules which would be equally authenticated, none of which, then and so developed, could in the nature of human affairs, with all due deference, be of universal obligation. Because in a state of nature there was no place for right and duty as such rules, and right and obligation are co-relative terms. Nor indeed is it at all probable that the most extensive rule that might be developed as a rule of human conduct in the civil state, either by" the aid of reason, when exerted in reference to the constitution of human nature and the adventitious state of man’s being, or by direct human legislation itself, could be of universal obligation. Because in the nature of things all such must be subordinate to some inalienable rights which pertain to man alike in a state of nature as when in the civil state, such as the right of self preservation; and consequently must put a limit to the operation of all rules set on foot by the civil state. Then if it were conceded that notice before judicial sentence was a natural law, although not developed as' such until aferthe establishment of the civil state,, it could not be of universal obligation, even if it was the only law of all nature’s enactment that had laid dormant in her chancery until after the establishment of the civil state which gave occasion for its developement. But we have already remarked that the same process of reasoning which, after the establishment of the civil state would develope notice before judicial sentence as a law of nature, would develope many other rules which would be equally well authenticated as such. And as civilization and refinement might advance, some of these might be even better authenticated and therefore of paramount obligation. Not that the laws of nature (if any of these rules deserve that name) are unfixed or vanish before man’s progress in the scale of civilization and refinement; but that human affairs by this advancement are ever shifting and as they pass more or less from the influence of one of these rules they pass in the same ratio within the more direct influence of another, or else develope a new rule by the same process .that those already in existence were developed. And thus it is that some old rules come to have a more circumscribed sphere of action and others become entirely obsolete. .When therefore mischief would flow into society by the too general operation of a given rule there would be the same authority in that society to restrict its operation within conservative limits either by positive enactment or else by giving freer, and, to this extent, paramount scope to some already existing countervailing rules, that there was in the first place to give sway to the rule thus curtailed ; because the badge of its authenticity, which, in the first instance, consisted in its necessary agreeableness with the nature and state of man has ceased to accredit it to the full extent of its former operation, although it amply does so to a less extent. And there would therefore be'the same authority for thus restricting its operation that there was for its original adoption and that authority derived from the same source. Nor would any of these rules or modifications of them be any the less obligatory merely because they had been called rules of public policy instead of laws of nature, if they were essentially the same in their nature and had been derived from the same source and by the same process of reasoning. And we apprehend that all those rules of law which are usually called rules of public policy are of this character, having more or less authority and operation as the public policy they arc designed to sustain is of greater or less import to the community. Now among these rules that havte been and are so to be developed and are thus based, is that which sustains the inviolability of judicial sales : that which covers the officers of the law, judicial and ministerial, with the panoply of its protection, when within the pale of integrity and reasonable diligence : that which looks to the end of strife and the repose of society through the verity of the records of superior courts and the finality of their judgments and decrees when not disturbed by appellate power. And there are many others of like moment designed to sustain thb stability of titles to property, a stable administration of justice and to promote the peace and happiness of the country in general. Now when we consider that the inevitable result of holding notice before judicial sentence to be a natural law is a serious desecration of all these important rules, we have abundant reason to doubt the correctness of such a doctrine. Because, so far from preserving the peace and happiness of society in thus operating, its tendency is in this directly the contrary. For it cannot be denied but that, if any serious inroad be made Upon these great rules of property and repose, no little encouragement will at once be given to piratical adventures under color of law. The judicial declaration of the nullity of a judicial sentence is far different, in its consequenees, from its reversal on error. The latter does not affect titles, nor make innocent men trespassers, nor rob honest purchasers either of their money or the subject matter of their purchase after having been invited to buy under the sanctity of judicial proceedings. The former does all this and much more, for it .strikes a deadly blow at that confidence in and respect for the laws which is the highest guarantee for their enforcement. Then for any operation to such an extent as this, the rule in question falls far short of the standard of a natural law, and if so to any extent some of these others must be of paramount import when tried by the same standard. Perhaps however it would be more accurate to say that none of these rules are natural laws although doubtless the rendition of a judicial sentence against a defendant without previous notice express or implied would be a violation of one of the most important principles connected with the administration of justice. Nor have we been able to find that the common law consecrated this rule as a law of nature by a strict conformity to its provisions. On the contrary, there is very conclusivo evidence that it could not have been so regarded. The common law proceeding of outlawry was inconsistent with such an idea to its full extent. The result of this proceeding was in the first place a judicial sentence by which the defendant incurred a qualified forfeiture of his lands and goods and a suspension of his civil rights as a citizen: and in the second place it enabled the plaintiff in a civil action, by application to the court of Exchequer, or by petition, when his claim exceeded fifty pounds, to obtain satisfaction of his claim by a sale of the property thus seized. And there is a strong case as to a judgment of outlawry cited by the court in the case of McPherson vs. Carliff et al. 11 Serg. & Rawle 438, to sustain the proceedings of the probate court as to the sale of real estate when those proceedings were unsuccessfully attacked on the ground that it had proceeded under a total mistake as to the real parties in interest, the court having proceeded under the idea that a family of children, who were really bastards, were the heirs of the deceased. That case is cited from 10 Vin. (Title Record C. pl. 2, from Br. E. pl. 78,) “ Record of outlawry of divers persons was certified in the Exchequer, among whom one was certified outlawed and was not outlawed, and that his goods forfeited were in the hands of I. N., and upon process made against him he came and said he was not outlawed, and parcel of the record cauri by chancery out of B. It. into the Exchequer: and Gkebn, Justice of B. R., came into the Exchequer and said he was not outlawed, but that it was misprison of the clerk. Siciroirai, said though all the justices would record the contrary they shall not be credited when we have recorded that he is outlawed. Querce, what remedy is for the party ? It seems it is a writ of error inasmuch as there is no original against him but only record of outlawry without original. (Br. Record, pl. 49) and in the same book,pl 4, cites Br. Error, pl. 78, it is said the diversity is this, that a man may assign error on a thing separate or out of the record but he cannot falsify it.” The custom of foreign attachments, by which goods in the hands of a third person might be sold or money attached and unless the debtor appeared withii^' dnc.year and successfully disputed the debt, he was forever concluded as to his rights in the property or money, was also inconsistent with such an idea to its full extent. ■ The mle of the absolute verity of the return of the sheriff that he had sxecuted process, although in fact and in truth he had never djme so, was directly inconsistent with the idea that notice before judgment was a natural law because if so, the rule of the verity o\ the sheriff’s return would have been an absolute nullity. Ar appearance of an unauthorized attorney was of the same ckss. So was the Scotch law of Horning. It .was assimilated to the custom of foreign attachments in several respects. There is a, case in 4 Bing. 686, (Douglass et al. assignees, vs. Forrest ex. of Hunter,) where, in an action in England on one of these judgments of horning, it was contended that the judgment should be held as a nullity upon the principle of universaljustice, as the counsel expressed it, there having been no notice previous to the judgment of horning. But the English court refused to so hold and said, “ On this question we agree with the defendant’s counsel that if these decrees are repugnant to the principles of universal justice, this court ought not to give effect to them. But we think these decrees are perfectly consistent with the principles of justice. If we hold that they were not consistent with the principles of justice we should' condemn some of the proceedings of our own courts.” Finding then by this examination upon principle that notice before judicial sentence is no natural law in that sense that human laws would be strengthless before it, and also finding that the common law has not consecrated it as such by a strict conformity to its provisions, we are now at full liberty to examine into the common law for fixed and known principles, if any such there be, which may be inconsistent with the nullity of j ujicial sentence pronounced without previous notice to the defendant and an opportunity to defend. If there be such fixed and known rules and they are well founded in public policy, that look to the stability of titles, the stated, peaceful ¿{¡$d quiet administration of the laws and to the repose of society in general, they must be considered of paramount obligation, although in their enforcement cases of individual hardship may arise. And this upon the maxim, as old as the common law itself “ that a private mischief shall be rather suffered than a public inconvenience.” A rule that has (ipplication to all public sanctions in government and in legislation and is plainly recognized in some of the declarations in oiir bill of rights. And it has never been considered a valid objection to a rule of public policy that it may produce disadvantages unjustly to an individual, for partial inconvenience is the inevitable consequence of every such rule : nevertheless the production of the general good authorizes their establishment. Indeed, “ partial evil is universal good.” It may be safely assumed that by the ancient common law, the idea that a judicial sentence was a nullity had no place at all; because so long as the King himself sat in judgment, such an imputation would have been a direct invasion of the principle that “ the King can do no wrong.” Nor subsequently, when his multiplying cases of state induced him to iommission judges to dispense justice throughout his kingdom; for they so dispensed justice not for themselves but for the King, as the direct representative of majesty in .the judgment seat, and as courts were the repositories of the same judicial powers that had been before in the King and were to return to him again in his political capacity whenever their commission might come to an eiid. But after the establishment of inferior courts with limited and special jurisdiction closed to appellate review otherwise than hrough the powers of superintendency and control assumed by King’s Bench, and the rule had been adopted as to all such ccurts to restrict their action within the express and explicit letter if their privileges, (3 Black. Com. conclusion of 6th chap. p. 85) a fiundation was laid for such an idea as to the sentences of these iourts, such an idea being a consequence of such a rule as to the iction of these courts : because the rule itself was based upon tie notion that the judicial powers of these courts derogated fron the powers of the common law courts, not only of those at Nest-minster, but of all others that were open to the appellate lowers of these, and their powers were therefore in their essence limited powers. But nevertheless there was no ground for any such idea is to all these other courts of record, although some of them were limited in their jurisdiction like these inferior courts to particular subjects, persons or places; because, although thus limitel in their jurisdiction the judicial powers invested in them were not limited powers, but were of the same class of those with wlich the courts at Westminster were invested. Now in order that the rules oí which we are in search maybe traced to a reasonable souce and thus be authenticated, upm principle as well as by authority, to be fixed rules of the common law, let it be assumed that the brief expose just given of the character of the powers invested in these two classes of courts, is correct. That is to say, that the powers invested in. the superior courts were general powers and those vested in the inferior courts limited powers. And the consequence would be, as to the former, that there could be no defect of power so long as judicial action was confined to a subject within the jurisdiction of one of these courts, and consequently the functionary could never be a trespasser, however contrary to law might be the proceedings on such a subject matter. But as to the latter there would be a delect of power, not only when the subject might be without the jurisdiction, but also when within it, if the mode of action was without the limits of the defined boundary, and coascquently the functionary would be a trespasser whenever the boundary of his powers had been passed, either as to the subject matter or the mode of proceeding; because when the powers of the functionary ended, the acts af the trespasser began, all acts beyond these powers being but the private acts of a private person. Accordingly the doctrine is distinctly laid down by some of the most respectable authorities that “ The judgment of a superior courtis not void but only voidable by plea on error.” (8 Bac. Ab. torn and voidable, (C.) p. 170, citing 2 Salk. 674. Priggs vs. Adams, S. C. Carth. 274); thus an erroneous attainder is not voidbut voidable by writ of error. (2 Inst 184. 2 R 3 fr. 21, 22.) See also 1 Chitty PL 181; and cases cited in note (T.); also 7 Baa Ab. 67. “ The judgments of a superior court are never considered void and until set aside they are to be considered as regalar judgments for every purpose.” (Stebbin Walbridge vs. Hiand Hall, 3 Vermont Rep. 114.) “ A judgment of a court of conpetent jurisdiction, though rendered in a form of proceeding unknown to our practice and apparently without service of process cannot be treated as a nullity while unreversed.” (Weyer vs, Zane, 3 Ham. Ohio R. 306.) “However summary or irregular the judgment of a competent tribunal may be it cannot be treated as a nullity.” (Buell vs. Cross, 4 Ham. Ohio Rep. 329.) “When judgment on a forthcoming bond states that notice was duly proved it will be taken for granted in the appellate court unless there be a bill of exceptions showing the contrary; but if the judgment contains no .such statement and the defendant [lid not appear the judgment will be reversed as erroneous.” (4 Munford R. 380.) “ An imprisonment under a judgment cannot be unlawful unless that judgment be an absolute nullity, and it is not a nullity if the court has a general jurisdiction of the subject although it be erroneous.” (Ex parte Tobias Watkins, p. Marshall, C. J. 3 P. 202.) Nor will such a judgment be the less obligatory because the error is apparent upon the record. 3 Peters 207. And the corresponding doctrine laid down with equal distinctness, “ That the judges of the superior courts are never to be made liable either by civil proceedings or by indictment for any thing done by them in a judicial capacity.” (Hammon vs. Howell, 2 Modern R. 218. Miller vs. Seive, 2 Black. R. 1141. Doct. Grovevelt vs. Doct. Bomwell et al. 1 Ld. Raym. 454. 1 Salk. 396. 1 Swift’s Dig. 496. Reed vs. Hood & Burdine, 2 Nott & McCord 168. Young vs. Herbert, ib. 172. 1 Day 315. 2 Bay 5. Brodie vs. Rutlege, ib. 69. 2 Caines R. 312. Rambeel vs. Kelly, 1 Const. Rep. 64 and note.) And according to Lord Mansfield, in Mostyn vs. Fdbrigas, Cowper’s R. 172, the same rule applied to every judge of a court not of record, provided such court be “ subject to a superior review.” But although this doctrine is thus strongly laid down and is sustained by unbroken authority, still a judge who would commit a crime and by a mere evasion endeavor to screen himself under the pretext of exercising his official functions would doubtless be liable to prosecution. Because Sergeant Hawkins says, and no doubt correctly, in his 6th Book, ch. 28, 5, 6, “ II the Court of Common Pleas give judgment in an appeal of death or a justice of the peace, on an indictment of high treason and award execution, both the judge who sentences and the officer who executes may be guilty of felony, because these courts having no more jurisdiction over these crimes than mere private persons, their proceedings are merely void and without any foundation.” But this rule of exemption from liability has never been held applicable to the justices of inferior courts any longer than while they were acting within their jurisdiction, and the reason generally given is that their powers are limited and the mode of their exercise and the extent oftheir iurisdiction are marked out and defined. And in looking into this part of the subject, one cannot but be struck with the numerous statutes that have been passed ill England from time to time for the protection of this class of judicial officers; such as1 for the limitation of suits against them, provision that they must be previously notified of an intention to proceed against them, declaring that without such notice there shall be a non suit or nol. pros.; that such suits shall be brought in particular localities; that these justices may tender amends; that criminal information shall not be allowed against them except under given circumstances ; and others of like character, all designed to abate the rigor of the rule that made them trespassers and liable in most cases practically for the want of intelligence and learning and .the errors of an honest judgment. Now, in order to show the paramount sway of the first oí these two great rules of the common law we will refer to its operation in several cases, where it has been made to override the supposed general rule that every court must have jurisdiction both of the subject matter of the suit and of the person of the defendant, otherwise its judgments in personam will be a nullity. As one of these instances take the case of Priggs vs. Adams already cited (from 2 Salk. 674.) There the act of Parliament erecting the court of conscience in Bristol, provided that if any action shall be brought in any of the courts of Westminster upon any cause of action arising in Bristol and it appeared upon trial to be under forty shilling, that no judgment should be entered for the plaintiff- and “ il one be entered it should be void”, nevertheless the court of King’s Bench held that the judgment in the Common Pleas in this case for five shillings on such a cause of action was not a nullity, but was only voidable by plea on error because the Common Pleas was a superior court. In this case the want of jurisdiction of the subject matter was upon the face of the record and yet the judgment was held not to be a nullity. And it would be no answer to this to show any rule of pleading that might be supposed to have prevented the nullity of the judgment because any such rule would necessarily presuppose that the judgment was voidable only for the reason that “ it is a universal rule in regard to all things that are void that they are as if they had never been: void things are no things-.” Cable vs. Cooper, 15 John. R. 155, citing 22 Vin. 13 pl. 17. So the case of Skellun’s ex. vs. May’s ex. 6 Cranch R. 267, rests upon the same foundation. This case had been tried in the circuit court for the District of Kentucky, taken from thence to the supreme court of the United States and reversed and remanded, and, being again before the circuit court, it was then for the first time discovered to be a cause not within the jurisdiction of that court, and upon division of the judges as to whether it should be dismissed for want of jurisdiction that question was adjourned to the supreme court and after consideration it was determined that the circuit court of Kentucky should proceed with the cause. In this case then although jurisdiction did not appear upon the face of the record, and although the circuit court certified affirmatively that the cause was without the jurisdiction of the court, nevertheless for the reason that the merits of the cause had been finally decided in the supreme court its mandate had to be obeyed. And upon the same foundation it was said by Holt, C. J. in Domina Regina vs. Barnaby, 1 Salk. 182, that although the justice had no jurisdiction of a prosecution for cutting' down trees in the night time under the St. of 43 El. ch. 7, if the defendant had title to the land, and that, upon a conviction in such case, the justice, as well as he who might execute his sentence would be liable to an action, yet that if the justice’s proceedings were confirmed in B. R., in such case no action would lie against either “ for then it is supported by the authority of this court.” Here then although the justice had no jurisdiction of the subject matter, yet as soon as his judicial sentence has received the affirmative of a superior court, it has become as valid as it would have been in a case that had actually been committed by law to his jurisdiction and not excepted out of it as this was, the decision of the latter court having now become the law of the case, to remain so until reversed on error. In the first two cases, that is to say, the cases from 2 Salk. and from 6 Cranch, there was no margin for any presumption in favor of the jurisdiction of the court over the subject matter, because the contrary appeared. In the other case from 1 Salk. the principle is that upon a presumption of jurisdiction the superior court would pronounce a judgment that would render it forever afterwards impossible to show any thing against the jurisdiction of the inferior court. In all the cases however there was in fact and in truth an absolute want of jurisdiction of the subject matter. They were all cases that had never been committed to these courts respectively by law for their deliberation and adjudication and were therefore really without their powers. And if it be true that every judicial sentence is ipso facto a nullity, unless both the subject matter and the person be within its jurisdiction, these must all have been nullities. These are therefore cases that go to prove that this proposition, that the decision of a court on a case beyond its jurisdiction is a nullity, although true in the abstract, is to some extent practically false and is subservient at least to the paramount rule that the judgment of a superior court-is not void: and it must be also subject to another paramount rule that a judgment of a court of record, whose jurisdiction is superior and final, is conclusive to all the world and puts an end to all enquiry concerning matters decided by it. Because this was^the ground upon which the supreme court of the United States refused the writ of Habeas Corpus to Tobias Watkins, although urged to do so upon the ground that the record of the circuit court forthe District of Columbia showed upon its face that the offence, of which he was convicted, was not within the jurisdiction of that court but without it. Ex parte Tobias Watkins, 3 Peters 193. Upon the same ground rest the several decisions of the supreme court of the United States, that announce and reiterate the doctrine that although that court will not presume in favor of the jurisdiction of the other federal courts, because they are all courts of limited jurisdiction, and jurisdiction must therefore be alleged in their records, otherwise their proceedings are erroneous ; nevertheless that without such allegation their judgments are not absolute nullities which may be totally disregarded. And this seems clear from the remark of Mr. Justice Washington, in delivering the opinion of the court in McCormick vs. Sullivan, (10 Wheaton 192) that these courts “ are all of limited jurisdiction ; but they are not on that account inferior courts, in the technical sense of those words, whose judgments taken alone are to be disregarded.” And then by the remarks of Mr. Justice Woodbury, in delivering the opinion of the court in the case of The Bank of the United States vs. Moss et al. (6 Howard's U. S. R. 40,) when combating the idea that, the judgments of these courts, when jurisdiction was not alleged, were nullities, “ That this view is supported by the English doctrine. There though judgments of inferior courts or commissions are often void, when on their face clearly without their jurisdiction and may be proved to be so and avoided without writ of error, (3 Bac. Ab. Error A. 10 Coke 77, a. Hawk. P. C. ch. 50, sec. 3,) yet the judgment of a superior court is not void, but only voidable by plea on error.” Bac. Ab. Void and Voidable, C. 2 Salk. 674. Carth. 276. Nor is this remark of any the less force in showing the ground upon which these decisions rest (that of the distinction between superior and inferior courts as to the conclusiveness of their judgments until reversed) that the particular case upon which Judge Woodbury was remarking had been tried upon the merits, because the principle is the same whether the judgment was rendered upon default or after the trial of issues of fact. No distinction as to this is to be found in any English case; nor indeed could it seem to have any existence any where unless it would be conceded that cohsent could give to a court jurisdiction of a subject matter that had not been committed to it by law. If then this rule as to the validity of the judgments of a superior court will in some cases override the undoubted rule that to authorize a judgment the court musthave jurisdiction of the subject matter and of the person, so far, in some cases, as not only to ’prevent the consequences of the judgment being held void that was rendered by a court having no jurisdiction at all over the subject matter, but actually to make such judgment perpetually good against all the world, as in cases where the court was not only superior* but final in its powers, is it at all more unreasonable, or indeed as much so, that for the mere purpose of preventing the consequences of holding a judgment a nullity the same rule should be made to override, in cases where the court has undoubted jurisdiction of the subject matter that which requires also the jurisdiction of the person? Upon general principles there would seem to be much less difficulty in dispensing with jurisdiction of the person than the subject matter. For it would seem at first blush almost clear that, if the subject matter was without the jurisdiction of the court, there was no foundation at all for the entire proceeding; and that nothing short of something approaching veiy nearly to judicial legerdemain could sustain proceedings under such circumstances; while on the other hand if there was a plaintiff and a declaration there would seem at least to be one party and a regular complaint against another, and whatever judicial action the court might take on these would be upon a valid foundation. There would be another general consideration in favor of this view of the matter. Each person within the territorial jurisdiction of a court is subject to its power unless specially exempted, but causes of action are parceled out among different courts. Thus each court has jurisdiction of all persons within its limits unless specially excepted, but of no cause of action not committed to it. Therefore it would seem that there could very rarely be an absolute want oí power as to the person and might often be as to the subject matter. In other words, under our system all our superior courts have a general jurisdiction as to persons and a limited jurisdiction as to subject matter, and therefore there should be a more liberal intendment as to the jurisdiction of the person than of the subject matter. And this would seem to be the true foundation of the rule that, although a presumption will not be indulged as to the subject matter, yet presumptions as to jurisdiction over the person will be indulged. And this general view seems not unsustained by the usages of the English courts in sustaining jurisdiction as to the person in some cases upon the ground of native allegiance ; in olhers, upon the ground that the obligation sought to be enforced was contracted within the county; and in others, upon the ground that property had been left in the county under the protection of the laws. But apart from these general considerations there would seem to be others, touching the nature of the powers of a superior court and the protection of the judges of these courts, which is said by Ch. J. DeGray to be “ absolute and universal,” (Witter vs. Seare 2 Wm. Black. R. 1141) that are more conclusive. We have already alluded to the difference between the powers of superior and inferior courts, and shown that those ol the latter were essentially limited powers and the former general powers. But the nature of these general powers will be more fully developed by the definitions respectively of superior and inferior courts given by the supreme court of the United States in the case of Grignon’s Lessee vs. Astor et al. (2 Howard U. S. R. 341) ; in which case the county court of Brown county in the then territory of Michigan was held to be'of the former class and its proceedings, when collaterally assailed, held valid in ordering the sale of lands of an intestate, without notice either actual or constructive to the parties in interest, although the statute, under which it proceeded, in express terms enacted that, before the court should pass upon the representation of the necessity to sell, “ it shall order due notice to be given to all parties or their guardians to show cause against the granting of the license to sell,” and providing also publication in a newspaper in case any of the parties were non-residents. The following are the definitions alluded to above: “The'true line of distinction between courts whose decisions are conclusive, if not removed to an ap-\ pellate court, and those whose proceedings are nullities if their jurisdiction does not appear on their face, is this : a court which is competent by its constitution to decide on its own jurisdiction and to exercise it to a final judgment without setting forth in their proceedings the facts and evidénoe on which it is rendered, whose record is absolute verity, not to be impugned by averment or proof to the contrary, is of the first description: there can be no judicial inspection behind the judgment save by appellate power. Á court, which is so constituted that its judgments can be looked through for the facts and evidence which are necessary to sustain it, whose decision is not evidence of itself to show jurisdiction and its lawful exercise, is of the latter description, every requisite for either must appear on the face of their proceedings, or they are nullities.” It appears then by these definitions that among the powers invested in the courts of the former class is that of deciding upon its own jurisdiction. The definition of jurisdiction given in Burn’s Law Dictionary (page 407) is this, “Jurisdiction is authority or power which a man hath to do justice in causes of complaint brought before him.” And he cites Lilly Abr. 120, where that author remarks, “ The courts at Westminster have jurisdiction over all England; all the other courts are confined to their particular jurisdiction, which if they exceed, then whatever they do is erroneous.” And Ch. J. Shaw remarks in Hopkins vs. The Commonwealth, 3 Metc. R. 462, “ The word ‘jurisdiction,’ (Jus dicere) is a term of large and comprehensive import and embraces every kind of judicial action upon the subject matter from finding the indictment to pronouncing the sentence.” So it is said in 12 Peters R. 718. “Any movement by a court is necessarily the exercise of jurisdiction.” And although it is said correctly in 2 Howard U. S. R. 338, “ where there are adverse parties the court must have power over the subject matter and the parties,” this is but reiterating the general rule to which we have already seen there are exceptions, but which is of universal efficiency on a direct px-oceeding in error for reversal. Such being the powers of these courts and such their jurisdiction and its exercise, we will proceed to illustration with a supposed case. Suppose a declaration regularly filed in one of our circuit courts, process of summons regulaidy issued thereon and returned in proper time, endorsed as follows: “ Executed the within writ on the within named defendant by leaving a true written copy thereof at his residence in Washita county with Sarah Ann his wife who is a member of his family over the age of fifteen years.” At a proper time during the term upon calling the defendant and his failure to answer, the plaintiff moves for a judgment by default, whereby upon inspection of the sheriff’s return the question arises whether there has been such service as the law requires. There could seem to be no ground of doubt but this would be a clear case for the exercise of rightful jurisdiction in determining the question whether or not the return that the copy was left with the defendant’s wife sufficiently showed that the copy was left with “ a white person.” Because the question legitimately and directly arose in the regular progress of the cause and when passed upon would seem to be directly within the principle of the Dutchess of Kingston's case, (11 State Tr. 261,) restricted in operation in Scott vs. Sherman, (2 Black. R. 979,) to “ courts of record having competent jurisdiction of the subject matter,” and afterwards again enlarged in Gohan vs. Maingay (Irish Term R. 37, 39 & 50,) after full discussion and examination, to “all courts having competent authority.” When therefore the circuit court should have thus, within its rightful jurisdiction, decided this service of its process sufficient, and had so stated upon its record it would seem inevitable that a judgment thereupon rendered against the defendant could not be a nullity but must remain a valid judgment until reversed by appellate power. Because the judicial ascertainment of the due service of the process of summons in such a case must be as authoritative as when ascertained by the inspection of a return by a sheriff that he had executed the process upon the defendant in proper person ; since in each case the court exercised its competent judicial powers. And the judgment by default which followed would be equally valid in each case, and would stand upon the same footing in all respects, except that it might be possible'that an appellate court might reverse one of them for an erroneous adjudication as to the sufficiency of service, while in the other there would be no ground to suppose it insufficient. In both cases however the return of the sheriff was the record evidence, upon the inspection of which the court determined as to the existence of the fact upon which depended its rightful exercise of jurisdiction over the person of the defendant and having found this fact to exist in the exercise of its power to decide upon its own jurisdiction and so entered it of record, the judgment against the defendant seems necessarily valid until reversed on error. To determine whether or not the service of the process of summons is sufficient, is certainly, at this stage of the proceedings, as regular and as clearly within the rightful jurisdiction of the court as to these questions as would be decisions as to others at a subsequent stage of the proceedings as to such. In other words, the question presented as to the sufficiency of service is a case as legitimate to call into action the judicial powers of the court as to that question, as a demurrer to the declaration, interposed by the defendant, would be a case as to questions that would be thus raised. And each would be but different steps taken by the court in adjudicating upon the subject matter or “ cause of complaint brought before the court,” by the declaration, which, under our practice, is the first step. Nor does the service of process of summons upon the defendant or the determination by the court that it has been properly served, confer any new power upon the court. If so the court would have power conferred upon it by its own officers and by itself, which would be absurd. The court had already power over the defendant, if within reach of its process, and the process is the instrumentality by which this power can be rightfully exercised. If the power is exercised without the process it is wrongfully exercised, but not the less exercised because wrongfully exercised. It is still the exercise of judicial power and the record speaks the verity of its exercise as the sheriff’s return of “Executed” speaks the verity of service of process, although there may have been in fact no service at all. If a process of summons were executed upon an Ambassador, or upon a citizen of another State within his own sovereignty; or a court marshal should have one executed on one not subject to marshal law, all such would be nugatory acts, and there would be no more authority in such courts over such persons than before the service of process upon them. Notice or no notice then cannot affect the question of judicial power, but can only relate to its rightful exercise. The result of this mode of reasoning then from the premises that superior courts are invested by law with the power to decide upon their own jurisdiction, is simply the same that is announced by the authorities that we have first cited that the judgments of such courts are not void but only voidable by plea on error ; and is in exact harmony with that other doctrine that the protection in regard to the judges of these courts is absolute and universal. And then these three concurring doctrines being thus well sustained by reason, authority and obvious public policy, and being in direct conflict with the supposed paramount rule that a judicial sentence without previous notice and an opportunity to defend is an absolute nullity, which at most can only work private mischief, we are of opinon that this, although a most important rule of law, must yield to the rule that judgments of superior courts are not void but only voidable by plea/ on error. ' The consequence is that if a cause of complaint brought before one of these courts be of a subject matter actually within its jurisdiction, so as to give a foundation for its proceedings, al-' though in these there may be errors of the most palpable kind, although in the exercise of its jurisdiction over this subject matter, it may have disregarded, misconstrued or disobeyed the plain provisons of the law, which gave it the power to hear and determine the case before it, nevertheless its judgment is not a nullity which may be entirely disregarded but must stand and be operative until reversed on error or appeal. And this, because, as is said by the supreme court of the United State, in the case of The United States vs. Aredondo et al. 6 Peters 729, “ It is a universal principle that when power or jurisdiction is delegated to a public officer or tribunal over a subject matter, and its exercise is confided to his or their discretion, the acts .so done are binding and valid as to the subject matter, and individual lights will not be disturbed collaterally for any thing done in the exercise of that discretion within the power and authority conferred. The only question which can arise between an individual claiming a right under the act done and the public or any person denying its validity, are, power in the officer and fraud in the party. All other questions are settled by the decision made or the act done by the tribunal or officer; whether executive (1 Cr. 170, 171,) legislative (4 Wheat. 423, 2 Peters 412, 4 Peters 563,) judicial (11 Mass. 227, 11 Serg. & Rawle 429, adopted in 2 Peters 167, 168,) or special (20 J. R. 739, 740, 2 Dow. Par. Cases 521,) unless an appeal is provided for, or other revision by some appellate or supervisory tribunal is prescribed by law.” We are fully aware that there are highly respectable authorities, besides some of the previous decisions of this court, which are directly against the conclusion to which we have arrived on the main question; but, with due deference, we think all such have lost sight of the controling distinction between the judicial powers of superior and inferior courts of special and limited jurisdiction and the consequent paramount doctrine that the judgment of a superior court can never be a nullity to be entirely disregarded. The English cases usually relied upon certainly afford no just'grounds for conclusions opposite to ours, for those cases, like the old case of Buchannon vs. Rucker. (1 Camp. R. 63) and the most recent of Farguson vs. Mahon, (3 Per. & Dav. R. 143) having arisen upon actions of assumpsit upon foreign judgments, their true doctrine is simply that, to raise an assumpsit in law, the party assuming must either directly or indirectly be personally connected with the matter out of which the assumpsit is to be raised, all foreign judgments being there regarded as butpri-ma facia evidence of debt or duty. And as to American authorities, some of these have been essentially modified ; as the earlier by the later decisions in New York. (Foot & Beebe vs. Stevens, 17 Wend. 483. Hart vs. Leixas, 21 ib. 40) ; or strongly countervailed by the decisions of other tribunals of higher authority, as the case of Wm. M. Gwin et al. vs. McCarroll, (1 Smedes & Marsh. 351) by the case oí Grignen’s Lessee vs. Aston et al. (2 How. U. S. R. 319) ; or are equivocal and evasive. (See Mr. Justice Trim-ble’s opinion as judge of the circuit court of Kentucky, quoted verbatim and endorsed in gross by the supreme court of the United States in Hollingsworth vs. Barlow et al. 4 Peters 475.) Nor do any of the cases decided in England or in the supreme court of the United States, where the judgment was declared invalid or null for want of jurisdiction of the person of the defendant, in any degree conflict with our views ; for after considerable search all such cases that we have been able to find were cases in inferior courts, and where there was an absolute want of jurisdiction of the person, as theMarshalsea case, which court had jurisdiction of only such as were of the King’s household ; and this case was not approved in England, and was greatly modified in Truscott vs. Carpenter, 1 Lord Raym. 229, where the court said “ And therefore the resolution in the case of Marshal-sea was a hai'd resolution and warranted by none of the books there cited.” And the case of Grant vs. Sir Charles Gould, (2 H. Black. R. 102) where the prohibition was asked because Grant was not a soldier and was therefore not liable to marshal law: and the case of Wise vs. Withers, (3 Cranch R. 331) where a court marshal had imposed a fine upon a justice of the peace, who, by act of Congress, was exempt from military duty and was consequently not a person over whom the court marshal had any jurisdiction. We might further fortify our conclusions as to the main point by a further reference to some authorities having some bearing upon it. (Buller's N. P. 244, 245. Ambler 761. Freeman 84. Str. 733. Harg. Law tracts 465, 469.) And also by some analogies in reference to the rule of conclusiveness of Ecclesiastical sentences, Exchequer and Admiralty condemnations, and by a reference to the doctrines of the conclusiveness of sales made under decrees and on judgments, and execution on adversary process *. and to the doctrine of protection to ministerial officers who issue and execute process both mesne and final; but we have already protracted our views to an unreasonable length and conclude as to this point by a brief summary of the grounds of our opinion. Notice before judicial sentence, is not a law'of nature; or, at least, not such in a sense that would make a human law nonobligatory, that would circumscribe the sphere of its operation. Nor has the common law consecrated it as such by a strict conformity to its mandates. • Then there may be an obligatory law paramount to the law of notice before judicial sentence. By the common law the judgment of a superior court is not void but only voidable by plea on error. This is established not only by the common law books, but is also expressly recognized as the common law by the supreme court of the United States. As a consequence of this law the judges of these courts are protected absolutely and universally from prosecution or suit for what they do in their judicial capacity. This rule of law and this consequence from it are reasonably to be accounted lor when the origin of these courts is looked at, and the nature of the judicial powers vested in them is considered. The existence of this rule of law and this consequence, besides being thus established by authority, is also further established by a legitimate process of reasoning predicated upon the foundation that among the powers vested by law in these courts is the power to decide upon their own jurisdiction. A direct and emphatic authority for this foundation is the supreme court of the United States in the case cited. . The rule then, that by the common law the judgments of a superior court are not void but only voidable by plea on error, being reasonably accounted for by an examination into the origin of these courts, and an examination of the nature of the powers vested in them, and being preserved as a part of the common law in books of the highest authority and expressly recognized as such by the supreme court of the United States and sustained by a legitimate process of reasoning from premises laid down by that court in reference to a distinguishing characteristic of superior courts, must be considered as ascertained and fixed law. . This being so, the question is one of precedence.' When these two rules of law conflict, which must yield ? To this the maxim of the law “that a private mischief shall be rather suffered than a public inconvenience” would seem to give a satisfactory answer. Because the law of notice looks clearly to the protection of private rights, while the law of the validity of judgments until reversed by appellate powers, whilst it also protects private rights, looks emphatically to the effective administration of justice, the sanctity of records, the protection of the ministers of justice that they may fearlessly discharge their duties, the stability of titles, the end of strife and the repose of society. And another answer equally conclusive is that a question, whether there has been notice or no notice, relates not to the investiture of judicial power, but its rightful exercise-. But although we adopt the rule in question as a very general rule, we do not adopt it or any of the rules with which it harmonizes, or is sustained as universal rules. We are not sure that we know any universal rule of law or that any exists that will have application to every ’matter that may be brought within the letter of the definition. We are sure this cannot embrace every case that might possibly arise that would come within the letter of its description, as we have more than once distinctly intimated in the course of our remarks. If a circuit court were to assume jurisdiction of a matter committed by law to the probate court exclusively, or the county court were to assume jurisdiction of a military officer, or if the probate, court were to try and condemn a man for high treason, such proceedings would be all nullities, because there would be no foundation at all for such proceedings: no case had ever been presented to bring into action any judicial power of these courts. - So a judgment might even be void under some circumstances, from some peculiar and inflexible policy of the law for the protection of infants, married women, idiots or lunatics. These general observations we make simply to indicate more distinctly our views of the important questions passed upon. The remaining question before us in, this case is whether or not the probate court is to be regarded as a superior court within the principles laid down. We answer emphatically that in our opinion it must be so considered. Because it is not only a court of record, but a constitutional court of fixed and permanent character invested with general jurisdiction and plenary powers over the matters committed by law to its peculiar cognizance and open to review by appeal. There is abundant authority thus to hold as to this court, and if there was not, it would be a matter of serious public concern. Because, while in point of law it is equal, in point of fact it is a more important court to the people of this State than the circuit court'. And this will be manifest at once when it is considered that it only requires a period of about forty years to pass every atom of property in the State real and personal and many choses in action through the ordeal of the probate court; while it is estimated that the whole would not be passed through the circuit court in an entire century. We feel freely warranted therefore, not only on the score of authority, but for cogent reasons of public policy, to fix this court upon the footing of superior courts. 11 Serg. & Rawle, 429. 5 Cranch, 173. 2 Howard S. C. R. 340. 6 Peters R. 220. Entertaining these views and so holding the law as to the two foregoing questions we have but to say, as to the supposed error in the case before us, that the general and well settled rule of law in such is that when the proceedings of such a court are collaterally drawn in question and it appears on the face of them that the court had jurisdiction of the subject matter, such proceedings are voidable only although there may be obvious errors, and therefore we can judicially see only what the court has done and not whether it has proceeded in inverso ordine, erroneously, according to the proof before them, or what they have omitted or ought to have done. Voorhees vs. The Bank of the United States, 10 Peters R. 476. The several previous decisions of this court as to the absolute nullity of the judgments of a superior court, when the record fails affirmatively to show previous notice express or implied to the defendant, will no longer be regarded as law and they are hereby overruled. And finding in the record that the court had jurisdiction of the subject matter and that the orders in question were made, we find no error in the record and the judgment of the circuit court must be affirmed.